# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

Thomas J. Murray & Associates, LLC,   Case No. 3:18CV1991

    Plaintiff

    v.   **ORDER**

Bailey & Glasser, LLP,

    Defendant

This is a dispute over attorney's fees between two law firms, plaintiff Thomas J. Murray & Associates, LLC (the Murray firm) and defendant Bailey & Glasser, LLP (B&G).

The two firms collaborated on the nationwide unintended-acceleration litigation against Toyota. A 2012 Memorandum of Understanding (MOU) specified how the firms would divide the attorney fees recovered from a defined set of cases and committed them to arbitrate their fee-related disputes.

Shortly thereafter, the Murray firm contracted with another firm to handle the *Macala* litigation, a sudden-acceleration case against Toyota that was not expressly subject to the MOU. This "Legal Counsel Association Agreement" (LCAA) – which named B&G as an intended third-party beneficiary and made several references to the Murray firm's "Co-Counsel" (*i.e.*, B&G) in the sudden-acceleration litigation – entitled the Murray firm to eighty percent of the attorney fees. The Murray firm agreed to resolve "[a]ny disputes concerning the Agreement . . . by confidential, binding arbitration[.]"

The firms prosecuted the *Macala* case to a settlement. After distribution of the settlement proceeds, the Murray firm objected that the MOU entitled it to an additional ten percent of the *Macala* fees. B&G rebuffed the objection and reminded the Murray firm of its obligation to arbitrate such a dispute

The Murray firm then sued B&G for breach of contract and related claims. The gravamen of the complaint is that B&G breached the LCAA by causing the Murray firm to receive a smaller fee from the *Macala* litigation than the LCAA entitled the Murray firm to receive.

Jurisdiction is proper under 28 U.S.C. § 1332(a)(1). (Doc. 1, PageID 1 at ¶¶1–2).

Pending is B&G's motion under Fed. R. Civ. P. 12 to compel arbitration. (Doc. 5). For the following reasons, I grant the motion.

## Background

In 2008, the Murray firm began investigating cases of "sudden acceleration events in Toyota vehicles." (Doc. 1, PageID 2 at ¶6). An attorney who had worked with the Murray firm on similar cases suggested that the firm's principal, Thomas J. Murray (Mr. Murray), contact B&G about "a collaboration" on the Toyota litigation. (*Id.*, PageID 2 at ¶7).

### A. Memorandum of Understanding

Discussions between the Murray firm and B&G yielded an MOU that addressed "the division of fees and expenses among the law firms working together in the lawsuits(s) against . . . Toyota[.]" (Doc. 5–1, PageID 36).[1] These lawsuits, the firms anticipated, would "comprise one or more class actions seeking to recover damages . . . on behalf of Toyota owners who have purchased . . . defective vehicles" as well as "certain selected personal injury and/or wrongful death cases resulting from such defects." (*Id.*).

---

[1] A third law firm was also a party to this agreement, but its involvement is not relevant to this case.

As amended in January, 2012, the MOU identified each "personal injury or wrongful death" case to which it applied on an attached schedule, Schedule A. (Doc. 5–2, PageID 42).

The MOU provided that if either B&G or the Murray firm "desire[d] to add a new matter to Schedule A," that firm "may propose its addition" to the other firm. (*Id.*). If both firms agreed to take the case, "such new matter will become a PI case and will be added to Schedule A by listing it on a revised Schedule A which must be signed by [both firms] each time a new PI case is added thereto." (*Id.*).

The MOU also created a tiered structure for distributing the attorney fees recovered from a successful personal injury case.

The firms were first to reimburse their expenses and pay any outside consulting counsel its referral fee. Thereafter, the Murray firm and B&G would each receive "eighteen percent (18%) of the amount of the Total Recovery" that the firms had obtained. (*Id.*, PageID 45–46). In addition, the "Originating Lawyer" –the firm that had proposed the addition of a new case to Schedule A – would be entitled to a further ten percent of the recovery. (*Id.*, PageID 46). Finally, the firms would distribute the remaining fees according to an "hours worked" formula. (*Id.*).

The Murray firm and B&G agreed that "[a]ny other dispute regarding this Agreement or its interpretation shall be resolved by confidential and binding arbitration by a single arbitrator selected by" the firms. (*Id.*, PageID 48).[2]

### B. *Macala* Litigation

In August, 2012, the Murray firm agreed to associate with the Law Offices of Justin P. Nadeau (the Nadeau firm), which brought the *Macala* unintended-acceleration case to the Murray firm's attention.

---

[2] Only disputes over litigation strategy were exempt from the arbitration clause. (Doc. 5–2, PageID 48).

Those two firms formalized their association in the LCAA (which the Murray firm also calls the First Nadeau Agreement). Under the LCAA, "the forty (40%) percent contingent fee client has agreed to pay for their representation . . . shall be shared by Nadeau and Murray with Nadeau being entitled to twenty (20%) percent thereof and Murray being entitled to eighty (80%) percent of said contingent fee." (Doc. 5–3, PageID 64 at ¶6) (internal capitalizations omitted).

B&G was not a party to this agreement, but the LCAA provided that "Bailey & Glasser, LLP, one of Murray's Co-Counsel, is an intended third-party beneficiary of this Agreement." (*Id.*, PageID 64 at ¶12). The LCAA also makes numerous references to "Murray's Co-Counsel," whom it identifies as "the attorneys with whom [Murray] is working on the Toyota Sudden Unintended Acceleration Litigation." (*Id.*, PageID 63).

Finally, the LCAA stated that "[a]ny disputes concerning the Agreement will be resolved by confidential, binding arbitration[.]" (*Id.*, PageID 64 at ¶11).

### C. Origins of the Fee Dispute

Though immaterial to the issue before me, the parties dispute what happened next.

B&G contends that, shortly after the Murray and Nadeau firms executed the LCAA, the Nadeau firm "sought to increase their percentage of the fee award from twenty percent to forty percent." (Doc. 6, PageID 104). The Nadeau firm "directed their request not to Mr. Murray but to B&G" and, according to B&G, the request "result[ed] in an agreed compromise of thirty percent" of the *Macala* recovery for the Nadeau firm. (*Id.*).

According to the Murray firm, B&G secretly "entered into a second 'Legal Counsel Association Agreement'" with the Nadeau firm. (Doc. 1, PageID 6 at ¶¶22–24). This agreement, which the Murray firm also calls the Second Nadeau Agreement, increased the Nadeau firm's fee

4

in the *Macala* litigation "by fifty percent (from 20% to 30%) of the forty percent (40%) contingency fee." (*Id.*, PageID 6 at ¶24) (internal capitalizations omitted).

### 1. The Murray Firm's Objection

The *Macala* case settled in 2015. (Doc. 1, PageID 6 at ¶19). Murray appeared as co-counsel on the case, and he reviewed and approved the settlement. (Doc. 5–5, PageID 78). It is undisputed that B&G did most of the work on the case, with the Murray firm contributing roughly fifteen hours of work. (Doc. 6, PageID 106)

In April, 2015, B&G sent the Murray firm a written breakdown of the planned distribution of the settlement proceeds. (Doc. 5–7, PageID 84 –93). These documents show that the Nadeau firm received thirty percent of the fees, the Murray firm received eighteen percent of the fees, and B&G received eighteen percent of the fees. (*Id.*, PageID 85, 87). The firms shared the remainder of the fees according to the "hours worked" formula. (*Id.*).

On April 8, 2015, Mr. Murray objected to this distribution. (Doc. 5–8, PageID 95).

The gravamen of his complaint was that *Macala* was "one of the cases that I originated." (*Id.*). He continued: "If so, I should be entitled to a 10% bump on the fee per our agreement on January 17, 2012" – that is, the MOU. (*Id.*).

### 2. *Macala* and Schedule A

B&G's principal, Ben Bailey, responded two days later.

"On the 10% bump," Bailey wrote, "we didn't give one to you or to us, because of the way it [*i.e.*, the *Macala* case] came in, to all of us as a group." (Doc. 7–1, PageID 27). After detailing his understanding of how the firms had taken over the *Macala* case, Bailey stated that, "instead of claiming a bump because we were called first or whatever, I put 'Joint/NA' on the

distribution sheet (i.e., no one gets the bump on this one) because we were all part of the intake." (*Id.*).

Bailey added that, "[f]or the same reasons, Macala has never been on the schedule to our MOU." (*Id.*).

It is undisputed that B&G and the Murray firm never amended Schedule A to the MOU to reflect that the *Macala* litigation was subject to the MOU's terms. However, Mr. Murray testified at a deposition in an unrelated case that the *Macala* litigation was "part of" the MOU.

An attorney representing B&G in that matter asked Mr. Murray whether the *Macala* litigation "was all part of the Bailey Grasser [*sic*] Group[?] That was assumed within the group, right?" (Doc. 5–5, PageID 79). When Mr. Murray began to answer, "Well . . .," B&G's lawyer interrupted him and asked whether "it's subject to the MOU." (*Id.*). Mr. Murray responded that "eventually it became a part of that group, yes." (*Id.*).

Counsel asked Mr. Murray again "if it was all part of the Bailey Glasser Group and MOU," and he responded, "Well, I assume it was." (*Id.*).

### D. Litigation

The Murray firm continued to press for a larger share of the fees. B&G advised Mr. Murray "of his contractual obligation to arbitrate" his dispute, but he "declined to participate" in arbitration. (Doc. 6, PageID 107). In August, 2018, the Murray firm sued B&G in this court.

In count one, the Murray firm brings a breach of contract claim.

The firm alleges that "B&G breached the First Nadeau Agreement by entering into the Second Nadeau Agreement," thereby altering "substantially [ ] and decreasing the consideration and attorney's fees to which [the Murray firm] was entitled" in the *Macala* litigation. (Doc. 1, PageID 9 at ¶¶35, 37).

6

Count two, a conversion claim, alleges that B&G "converted for itself and the Nadeaus money which rightfully then belonged to" the Murray firm under the LCAA by paying to itself and the Nadeaus "the increased attorney's fees . . . under the Second Nadeau Agreement." (*Id.*, PageID 8, 10, ¶¶33, 40).

Count three alleges that B&G committed fraud by "deliberately and secretly t[aking] multiple steps and actions to conceal" the fact that it had entered into the Second Nadeau Agreement and "altered . . . the attorney's fee percentages from those in the First Nadeau Agreement." (*Id.*, PageID 10 at ¶¶44–45).

Counts four and five allege tortious interference with contract and business relationships. Regarding the former, the firm alleges that "B&G intentionally procured the breach of the First Nadeau Agreement by agreeing and conspiring with one or both Nadeaus to drastically reduce the attorney fees to which [the Murray firm] was to be paid under that contract." (*Id.*, PageID 12 at ¶53). Regarding the latter, the firm alleges that B&G interfered in its relationship with the Nadeau firm "by secretly entering into a Second Nadeau Agreement whereby each sought to decrease substantially the amount of attorney fees to which [the Murray firm] was entitled under the First Nadeau Agreement[.]" (*Id.*, PageID 13 at ¶60).

Count six alleges that B&G and the Nadeau firm conspired to deprive the Murray firm of the fees to which it was entitled to under the First Nadeau Agreement by entering, or attempting to enter, the Second Nadeau Agreement. (*Id.*, PageID 13–14 at ¶¶64–65).

Finally, in count seven, the firm alleges that it is "entitled to the *Macala* settlement attorney's fees under the First Nadeau Agreement and to a constructive trust against B&G related to the funds [the Murray firm] should have received thereunder[.]" (*Id.*, PageID 14 at ¶69).

**Standard of Review**

The Federal Arbitration Act (FAA) "establishes a liberal federal policy favoring arbitration." *Epic Sys. Corp. v. Lewis*, --- U.S. ---, 138 S. Ct. 1612, 1621 (2018).

"As a result, when interpreting an arbitration agreement, any doubts are to be resolved in favor of arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Massad v. CVS Prescription Servs., Inc.*, 2017 WL 4271854, *3 (N.D. Ohio 2017) (Gwin, J.).

When addressing a motion to compel arbitration, I must consider: "(1) whether the parties agreed to arbitrate, (2) the scope of that agreement, (3) whether, if federal claims are asserted, Congress intended those claims to be nonarbitrable, and (4) if only some of the claims asserted in the complaint are subject to arbitration, whether to stay the remainder of the proceedings pending arbitration." *Id.*

"A party opposing a motion to compel arbitration must show that there is a genuine dispute of material fact as to whether there is a valid agreement to arbitrate between the parties." *Id.* "Because this standard mirrors the summary judgment standard, the Court views all of the facts and draws all inferences in favor of the party opposing arbitration, except that any doubts as to the *interpretation* of the agreement must be resolved in favor of arbitration." *Id.* (emphasis in original).

**Discussion**

There is no dispute that two valid arbitration provisions are at play in this case.

The MOU provides that, except for disputes over litigation strategy, "any other dispute regarding this Agreement or its interpretation shall be resolved by confidential and binding

8

arbitration[.]" (*Id.*, PageID 48). The LCAA similarly provides that "[a]ny disputes concerning the Agreement will be resolved by confidential, binding arbitration[.]" (*Id.*, PageID 64 at ¶11).

The only dispute is whether the Murray firm's claims are within the scope of either provision.

### A. Parties' Arguments

B&G contends that both contracts require the Murray firm to arbitrate.

It first emphasizes that the MOU "requires arbitration of disputes 'regarding this agreement *or its interpretation*.'" (Doc. 6, PageID 110). B&G then argues that "[w]hat the 2012 MOU requires for a case to be included within its scope is necessarily a question of 'interpretation,' and those kinds of disputes must be resolved in arbitration[.]" (*Id.*, PageID 110–11).

Recognizing that the parties never amended Schedule A to reflect that the *Macala* litigation was subject to the MOU, B&G argues that the firms effectively modified the MOU through their course of conduct. (Doc. 8, PageID 129–30). In support, it cites: 1) the distribution of the *Macala* proceeds according to the formula in the MOU; and 2) Murray's demand that the MOU entitled him to a ten percent "bump." (*Id.*, PageID 129).

Finally, B&G argues that the Murray firm is trying to recover "damages for claims based on and flowing from the alleged breaches of duties imposed by the 2012 MOU and the LCAA, which are the very documents containing the arbitration provision at issue." (*Id.*, PageID 111) (internal emphasis omitted). B&G contends that it can enforce the arbitration clause as a named third-party beneficiary of the LCAA and, as well, under an equitable estoppel theory. (Doc. 8, PageID 131–32).

The Murray firm disputes that either arbitration provision applies.

9

Regarding the MOU, the firm argues that the parties never amended Schedule A to include the *Macala* litigation. (Doc. 7, PageID 117–20). Because the MOU "states plainly the matters covered by it and excludes all matters to which it does not apply," the Murray firm argues that the arbitration provision is inapplicable. (*Id.*, PageID 117).

As for the LCAA, the Murray firm argues B&G "has no right to invoke the arbitration clause" in that contract. (Doc. 7, PageID 120). Because there is no dispute between the parties to that agreement – the Nadeau and Murray firms – and because B&G is not a signatory to the contract, the Murray firm argues that "B&G has no standing to invoke [the LCAA's] arbitration provision." (*Id.*).

### B. The LCAA Requires the Murray Firm to Arbitrate

Having considered these arguments, I conclude that the LCAA obligates the Murray firm to arbitrate its claims against B&G.

#### 1. Third-Party Beneficiary

"The United States Supreme Court has held that a litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement." *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1229 (9th Cir. 2013) (internal quotation marks omitted).

Nevada law, which the parties seem to agree governs the LCAA,[3] holds that "a third-party beneficiary is capable of enforcing an agreement to which they are not a party." *Dixson v. City of N. Las Vegas*, 2015 WL 3849160, *1 (Nev. 2015).

---

[3] In fact, the LCAA is silent as to which state's law governs its interpretation; it refers to Nevada law only in connection with arbitration proceedings. (Doc. 5–3, PageID 64) ("The arbitrator will apply the laws of the state of Nevada to any disputes."). Because the Murray firm has not disputed the applicability of Nevada law, I need not pursue the issue any further.

10

Although the parties do not cite any Nevada cases precisely on point, ordinary principles of contract law recognize that "[a]n arbitration agreement may be enforced by or against nonsignatories where a nonsignatory is a third-party beneficiary of the agreement." 21 Williston on Contracts § 57.19 (4th Ed. 2018); *see also Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (recognizing that, under California law, "nonsignatories can enforce arbitration agreements as third party beneficiaries"); *E.I. DuPont de Nemours & Co. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 201 (3d Cir. 2001) (same as to Delaware law).

In this case, the LCAA expressly identifies B&G as an intended third-party beneficiary of the agreement. (Doc. 5–3, PageID 64).

This is the best and, indeed, dispositive, evidence that the parties to the LCAA – the Murray firm and the Nadeau firm – intended to confer the benefits of the LCAA, including its arbitration provision, on B&G. *Washoe Cnty. Sch. Dist. v. White*, 396 P.3d 834, 838 (Nev. 2017) (courts look to "the language of the agreement" to "discern the intent of the parties").

What's more, the LCAA allocated responsibilities for the *Macala* litigation among the Murray firm and B&G and imposed various obligations on the firms.

It provided, for example, that "Murray and/or Murray's Co-Counsel will be designated as lead counsel for the Macala family and will have ultimate authority to make all decisions concerning the litigation[.]" (Doc. 5–3, PageID 63). Another provision expressly contemplated that the Murray firm and B&G would work together on the *Macala* litigation. (*Id.*, PageID 64 at ¶7) ("Murray and Murray's Co-Counsel . . . may engage other legal counsel and other professionals to assist it and share in the performance of their above responsibilities.").

There is no question, moreover, that the Murray firm's claims arise out of the LCAA.

11

The firm contends that B&G breached this agreement by causing it to receive a lower fee for the *Macala* litigation than what the LCAA otherwise provided. (Doc. 1, PageID 9 at ¶37). As shown above, *supra* at 6–7, the denial of the fee specified by the LCAA undergirds all the Murray firm's claims. (*Id.*, PageID 9–14 at ¶¶40, 44–45, 53, 60, 64–65, 69).

Given these considerations, the Murray firm's argument that B&G lacks "standing" to enforce the arbitration clause lacks merit.

In the cases on which the Murray firm's argument relies, *Dixson*, *supra*, 2015 WL 3849160 at *1, and *Hartford Fire Ins. Co. v. Trs. of Const. Indus.*, 208 P.3d 884, 889–90 (Nev. 2009), the non-signatory trying to enforce a contract was not named in the contract as an intended third-party beneficiary. Nor did the contracts in those cases expressly contemplate that the third-party would be involved in fulfilling the subject matter of the contract. Those cases are therefore not controlling, or even persuasive, here.

Because B&G is a named and intended third-party beneficiary of the LCAA, because the Murray firm's claims against B&G arise out of that agreement, and because LCAA committed the Murray firm to arbitrate "[a]ny disputes concerning this Agreement," I will grant B&G's motion to compel arbitration.

### 2. Equitable Estoppel

"Under equitable estoppel a plaintiff signatory to a contract containing an arbitration provision is prevented from avoiding the agreement to arbitrate if the plaintiff's claims rely on the contract as the basis for relief." *Bates v. Nevada Resort Properties Polo Towers Ltd. P'ship*, 238 P.3d 795, *1 (Nev. 2008) (Table).

In *Hard Rock Hotel, Inc. v. Eighth Judicial District Court*, 390 P.3d 166, *2 (Nev. 2017), the Nevada Supreme Court explained that:

12

equitable estoppel allows a nonsignatory to compel arbitration in two different circumstances. First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory. When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate. Second, application of equitable estoppel is warranted when the signatory to the contract containing the arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.

In this case, the Murray firm could not make out its claims against B&G without the LCAA. Its claims for breach of contract, conversion, tortious interference, fraud, conspiracy, and constructive trust "arise out of and relate directly to" the LCAA, given that each claim depends on the firm's allegation that it did not receive the fee award to which the LCAA entitled it. *Id.*

In other words, the subject matter of the dispute – whether B&G caused the Murray firm to not receive the fees to which it was entitled under the LCAA – is intertwined with the contract providing for arbitration – the LCAA. *Cf. Rajagopalan v. NoteWorld, LLC*, 718 F.3d 844, 847 (9th Cir. 2013) ("Where other circuits have granted motions to compel arbitration on behalf of non-signatory defendants against signatory plaintiffs, it was 'essential in all of these cases that the subject matter of the dispute was intertwined with the contract providing for arbitration.'") (quoting *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 361 (2d Cir. 2008).

Because the Murray firm's claims rely on a contract containing an arbitration provision, "[t]he equitable estoppel doctrine prevents [it] . . . from avoiding the agreement to arbitrate." *Ahlers v. Ryland Homes Nevada, LLC*, 367 P.3d 743, *2 (Nev. 2010).[4]

---

[4] Because I conclude that the LCAA requires the Murray firm to arbitrate its claims, I need not decide whether the same result obtains under the MOU.

## Conclusion

It is, therefore,

ORDERED THAT:

1. Bailey & Glasser's motion to compel arbitration (Doc. 5) be, and the same hereby is, granted; and

2. The Murray firm's complaint (Doc. 1) be, and the same hereby is, dismissed.

So ordered.

>                              /s/ James G. Carr
>                              Sr. U.S. District Judge